# UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA

KESHA R. SMITH,              )
                                 )
                                 )
                 Plaintiff,      )
                                 )
v.                                 )      No.  05-CV-157-SAJ
                                 )
JO ANNE B. BARNHART,     )
Commissioner of Social Security    )
Administration,             )
                                 )
                 Defendant.    )

## OPINION AND ORDER[1/]

Pursuant to 42 U.S.C. § 405(g), Plaintiff appeals the decision of the Commissioner denying Social Security benefits.[2/] Plaintiff asserts that the Commissioner erred because (1) the ALJ failed to consider Plaintiff's non-exertional limitations; and (2) the ALJ failed to consider Plaintiff's current medication regimen and ignored the testimony of the vocational expert.  For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff was born May 16, 1974.  [R. at 49].  Plaintiff is five foot six inches tall and 275 pounds.  [R. at 57].

---

[1/]   This Order is entered in accordance with 28 U.S.C. § 636(c) and pursuant to the parties' Consent to Proceed Before United States Magistrate Judge.

[2/]   Administrative Law Judge Lantz McClain (hereafter "ALJ") concluded that Plaintiff was not disabled by decision dated December 18, 2003. [R. at 11 - 23].  Plaintiff appealed the decision by the ALJ to the Appeals Council.  The Appeals Council declined Plaintiff's request for review on January 27, 2005.  [R. at 6].

Plaintiff completed a disability supplemental interview outline on January 27, 2003. [R. at 79]. Plaintiff wrote that she took breathing treatments four to five times each day and had a difficult time doing anything else. [R. at 79]. Plaintiff indicated that she slept two to three hours each night. [R. at 79]. Plaintiff noted that she coughed most of the night. [R. at 79]. Plaintiff lives in a house with her three children. [R. at 79]. Plaintiff cooks approximately four times each week and it takes her two to three hours to cook a meal. [R. at 80]. Plaintiff noted that she was able to wash dishes, sweep floor and clean the bathrooms and bedrooms but that it took her a lot of time to perform such chores. [R. at 81]. Plaintiff estimated that she spent six hours performing these chores. [R. at 81]. Plaintiff noted that she shopped for food about four times each month and that shopping took her about three hours. [R. at 81]. Plaintiff wrote that when her asthma acts up her bladder becomes weak and she urinates on herself. [R. at 83].

Plaintiff's medication list indicated Plaintiff was taking four treatments of albuterol solution four times each day, prednisone tablets three times per day, two puffs of advair each day, albuteral inhaler, two puffs per day, and singular once a day. [R. at 93, 96].

On October 21, 2001, Plaintiff entered the Tulsa Regional Medical Center emergency room. The time given on the treatment record is 16:27. [R. at 98]. Plaintiff complained of a cold for the previous two weeks with frequent nausea and vomiting. Plaintiff stated she was, at that time, vomiting anything she ate. The record notes that at 19:10 Plaintiff notified the admissions clerk that she was leaving because she could no longer wait for treatment. [R. at 98].

On December 2, 2001, Plaintiff was treated complaining of headaches for the previous three days. Plaintiff was diagnosed with sinusitis. [R. at 100]. On March 22,

2002, Plaintiff was treated in the emergency room for complaints of coughing and red throat.  Plaintiff was diagnosed with bronchitis.  [R. at 105].

On January 11, 2002, Plaintiff complained of a stuffy nose which had been ongoing since September 2001.  The doctor diagnosed allergic rhinitis.  Plaintiff was prescribed two puffs, four times each day and Afrin for up to three days.  [R. at 161].

On March 25, 2002, Plaintiff complained of a bad cough with nothing helping her cough.  [R. at 158].  X-rays dated March 28, 2002 were interpreted as revealing clear lungs.  No evidence of cardiopulmonary pathology was identified.  [R. at 108].

On April 12, 2002, Plaintiff complained of coughing since the end of March.  Plaintiff stated that her congestion had not improved.  [R. at 155].  Plaintiff was diagnosed with chronic bronchitis.

Plaintiff reported to the emergency room on May 8, 2002, with the time noted as 1515.  [R. at 112].  Plaintiff complained of cramping and spotting for the previous three weeks.  Plaintiff was called at 2113 to see the doctor, with no response.  [R. at 112].

Plaintiff was treated at the emergency room on August 5, 2002.  Plaintiff indicated that she had fallen and injured her left knee.  [R. at 115].  X-rays were unremarkable.  [R. at 117].  Plaintiff's knee was wrapped and she was discharged.  [R. at 115].

Plaintiff was treated October 23, 2001 at Morton Health Services complaining of nasal congestion for the previous three weeks.  [R. at 192].  Plaintiff was prescribed Bactrim.  [R. at 192].

Plaintiff was treated October 31, 2002 with complaints of breathing trouble.  [R. at 120].  Plaintiff states that she began coughing and having trouble breathing and complained of headaches.  [R. at 121].  Plaintiff noted that she coughed so much she vomited.  [R. at

121].  The record notes that Plaintiff "watched me put a jet [undecipherable] on [her] chart. Hopped out of chair and told her husband they were going to another hospital."  [R. at 121].

Plaintiff was treated at Morton Comprehensive Health Services on October 31, 2002, for complaints of nasal congestion, itchy nose and watery/itchy eyes.  [R. at 191].  Plaintiff was given samples of Zyrtec.  [R. at 191].

Plaintiff went to Hillcrest Medical Center on October 31, 2002.  [R. at 122].  Plaintiff complained of problems related to her asthma.  Plaintiff noted that her problems had gradually worsened throughout the day and that nothing improved her condition.  [R. at 123].  Plaintiff was diagnosed with acute asthma and discharged with albuterol, prednisone, and other medications.  [R. at 124].  Plaintiff's chest x-ray was negative.  [R. at 127].

Plaintiff was treated at Morton Health Services on November 14, 2001, complaining of nasal congestion.  Plaintiff was provided samples of Claritin D and prescribed Nasonex. [R. at 190].

Plaintiff was treated at Hillcrest Medical Center on November 18, 2002.  [R. at 130]. Plaintiff complained of shortness of breath.  [R. at 131].  Plaintiff's condition at discharge was "good," and Plaintiff was discharged with medications.  [R. at 132].

Progress notes from the Morton Health Clinic, dated November 18, 2002, indicate Plaintiff complained of an increase cough and wheezing.  Plaintiff indicated she could not sleep at night due to her cough.  [R. at 189].  Plaintiff was prescribed Albuterol with two refills, and inhaler with two refills, Phenergan with codeine up to four times per day with no refills.  [R. at 189].

-- 4 --

Plaintiff was treated at Hillcrest on December 12, 2002.  [R. at 193].  Plaintiff complained of a sudden onset of her asthma symptoms.  [R. at 194].  A bronchodilator treatment was given with results reported as "complete relief."  [R. at 195

Plaintiff was treated at Hillcrest Medical Center on February 17, 2003.  [R. at 163].  Plaintiff complained of an asthma attack beginning approximately thirty minutes prior to her arrival.  [R. at 165-66].

Plaintiff was treated at Hillcrest Medical Center on February 27, 2003.  [R. at 201].  Plaintiff complained of gradual onset of her asthma symptoms and noted that her Albuterol was "out."  [R. at 202].

A Pulmonary Function Study is dated February 24, 2003.  Plaintiff was noted as 5'6" tall and 270 pounds.  [R. at 171].  Plaintiff's forced vital capacity prior to bronchodilator ranged from 2.73 to 2.82.  Plaintiff's FEVI was 2.22 to 2.35.  Plaintiff's forced vital capacity after the brochodilator ranged from 3.01 to 3.22.  [R. at 171].  Plaintiff's FEV1 was 2.50 to 2.58.  [R. at 171].

Plaintiff was seen at the Morton Comprehensive Health Services clinic for complaints of breathing and coughing on March 7, 2003.  [R. at 187].  Plaintiff was prescribed medicine and diagnosed with "bronchitis/asthma."  [R. at 187].

A Physical Residual Functional Capacity Assessment was completed by an physician on March 5, 2003.  [R. at 185].  Plaintiff was noted as being able to occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk about six hours in an eight hour day, sit about six hours in an eight hour day, and push or pull an unlimited amount.  [R. at 179].

Plaintiff was seen at Morton Comprehensive Health Services on May 20, 2003.  Plaintiff was assessed with asthma.  Plaintiff was to continue on albuterol inhaler and

"albuterol neb treatment one po q id prn for wheezing #25 given." [R. at 212].  On June 17, 2003, Plaintiff's asthma was described as poorly controlled due to Plaintiff 's lack of medications and funds for medicine.  [R. at 211].  Plaintiff was prescribed Prednisone at 30 mgs per day for one week, 20 mgs per day for the second week, and 10 mgs per day for the third week.  Plaintiff was to be started on Singular, 10 mgs per day the first of July. Plaintiff was seen again on July 15, 2003.  [R. at 210].  Plaintiff's asthma was described as "controlled."  [R. at 210].

Plaintiff was treated at Tulsa Regional Medical Center on September 1, 2003.  [R. at 216-17].  Plaintiff was noted as having a history of asthma and being short of breath the morning, with complaints of nausea and vomiting.  [R. at 217].  Plaintiff was treated again on September 6, 2003.  [R. at 220].

Plaintiff's hearing before the ALJ was on October 1, 2003.  [R. at 225].  Plaintiff testified that she was 29 years old at the time of the hearing before the ALJ.  Plaintiff stated that she completed high school and has a GED.  [R. at 229].

Plaintiff stated that she was unable to work due to her asthma.  [R. at 231]. According to Plaintiff, she experiences shortness of breath, chest pains, and wheezing.  [R. at 231].  Plaintiff stated that housework and walking exacerbate her shortness of breath. [R. at 231].  Plaintiff believes she could walk for about ten minutes before she would be required to rest.  [R. at 231].  Plaintiff can stand for about five to ten minutes before she would need to sit.  [R. at 231].

Plaintiff testified that she regularly experiences chest pain due to her asthma and that the pain lasts for approximately 20 minutes.  Plaintiff has constant wheezing, which is exacerbated by walking.  Plaintiff also stated that she suffered from frequent headaches

which last from one to two hours.  [R. at 232].  According to Plaintiff, the Albuterol gives her the headache.  [R. at 233].  Plaintiff also stated that she has some leakage which occurs when she is wheezing.  [R. at 233].  Plaintiff described her leakage as a total lack of control over her bladder and indicated that it happened frequently.  Plaintiff noted that it occurs on a daily basis.  [R. at 234].

Plaintiff also stated that she experiences sadness which sometimes lasts a day or two about two times each week.  [R. at 234].  Plaintiff stated the sadness was related to her weight gain.  According to Plaintiff, her normal weight is about 260 or 270, and Plaintiff, at the time of the hearing weighed 318.  [R. at 235].  Plaintiff noted that she had gained weight in the previous six months.  [R. at 235].

Plaintiff testified that she is treated in the emergency room about two or three times each month for asthma.  Plaintiff also does breathing treatments at home.  According to Plaintiff, the breathing treatments take approximately 30 minutes each time and she does them four to six times each day.  [R. at 236].

Plaintiff lives in a house with her four children, ages 11, 9, 7, and 5.  [R. at 236]. Plaintiff stated that she is able to do some things at the house such as washing dishes or cooking a small meal.  [R. at 237].  Plaintiff noted that she cannot be around household cleaners, ammonia, or aerosol sprays, and that her asthma is aggravated by temperature and humidity.  [R. at 238].  On some days, Plaintiff is unable to do anything, and she simply rests.  [R. at 239].

According to Plaintiff, she is unable to visit friends because she has bladder problems and she does not want to mess up anyone's furniture.  [R. at 240].  Plaintiff noted that she rarely left her home except for doctor's visits.  [R. at 240].

## II. SOCIAL SECURITY LAW AND STANDARD OF REVIEW

The Commissioner has established a five-step process for the evaluation of social

security claims.  *See* 20 C.F.R. § 404.1520.  Disability under the Social Security Act is

defined as the

> inability to engage in any substantial gainful activity by reason
> of any medically determinable physical or mental impairment
> . . . .

42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Social Security Act only if his

> physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work in the
> national economy. . . .

42 U.S.C. § 423(d)(2)(A).[3/]

The Commissioner's disability determinations are reviewed to determine (1) if the

correct legal principles have been followed, and (2) if the decision is supported by

substantial evidence.  *See* 42 U.S.C. § 405(g); *Bernal v. Bowen*, 851 F.2d 297, 299 (10th

Cir. 1988); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

---

[3/]   Step One requires the claimant to establish that he is not engaged in substantial gainful activity (as defined at 20 C.F.R. §§ 404.1510 and 404.1572).  Step Two requires that the claimant demonstrate that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 1521.  If claimant is engaged in substantial gainful activity (Step One) or if claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, claimant's impairment is compared with those impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings").  If a claimant's impairment is equal or medically equivalent to an impairment in the Listings, claimant is presumed disabled.  If a Listing is not met, the evaluation proceeds to Step Four, where the claimant must establish that his impairment or the combination of impairments prevents him from performing his past relevant work.  A claimant is not disabled if the claimant can perform his past work.  If a claimant is unable to perform his previous work, the Commissioner has the burden of proof (Step Five) to establish that the claimant, in light of his age, education, and work history, has the residual functional capacity ("RFC") to perform an alternative work activity in the national economy.  If a claimant has the RFC to perform an alternate work activity, disability benefits are denied.  *See* *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

The Court, in determining whether the decision of the Commissioner is supported by substantial evidence, does not examine the issues *de novo*. *Sisco v. United States Dept. of Health and Human Services*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner. *Qualls v. Apfel*, 206 F.3d 1368 (10th Cir. 2000); *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). The Court will, however, meticulously examine the entire record to determine if the Commissioner's determination is rational. *Williams*, 844 F.2d at 750; *Holloway v. Heckler*, 607 F. Supp. 71, 72 (D. Kan. 1985).

"The finding of the Secretary[4/] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is that amount and type of evidence that a reasonable mind will accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Williams*, 844 F.2d at 750. In terms of traditional burdens of proof, substantial evidence is more than a scintilla, but less than a preponderance. *Perales*, 402 U.S. at 401. Evidence is not substantial if it is overwhelmed by other evidence in the record. *Williams*, 844 F.2d at 750.

This Court must also determine whether the Commissioner applied the correct legal standards. *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The Commissioner's decision will be reversed when he uses the wrong legal standard or fails to clearly demonstrate reliance on the correct legal standards. *Glass*, 43 F.3d at 1395.

---

[4/] Effective March 31, 1995, the functions of the Secretary of Health and Human Services ("Secretary") in social security cases were transferred to the Commissioner of Social Security. P.L. No. 103-296. For the purpose of this Order, references in case law to "the Secretary" are interchangeable with "the Commissioner."

## III.  ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ found that Plaintiff had the "severe" impairments of a respiratory disorder and obesity.   The ALJ concluded that Plaintiff's allegation of urinary leakage and headaches were not severe.   The ALJ did not provide reasons for the conclusion that urinary leakage and headaches were not severe.

The ALJ concluded that Plaintiff was able to sit six hours in an eight hour day, stand two hours in an eight hour day, and walk two hours in an eight hour day.  [R. at 19, 20]. The ALJ found that Plaintiff was able to lift or carry ten pounds.  [R. at 20].

The ALJ found that Plaintiff was unable to return to her past relevant work. However, based on the testimony of a vocational expert, the ALJ concluded that Plaintiff could perform a significant number of jobs in the national economy and was therefore not disabled.  [R. at 21].

## IV.  REVIEW

The Step two burden placed on Plaintiff is *de minimis*.  *Williams*, 844 F.2d at 751. The Commissioner's own regulations state that

> [g]reat care should be exercised in applying the not severe impairment concept.  If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step.  Rather, it should be continued.

Social Security Ruling 85-28 (1985).  But, more importantly, Step two "is an administrative convenience [used] to screen out claims that are 'totally groundless' solely from a medical standpoint." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (*per curiam*) (*quoting Farris v. Secretary of HHS*, 773 F.2d 85, 89 n. 1 (6th Cir. 1985)).  In other words, if an ALJ

decides that Plaintiff has <u>any</u> "severe" impairment, then the ALJ proceeds past Step Two in evaluating Plaintiff's ability to perform work.  At the remaining steps of the sequential evaluation, <u>all</u> of Plaintiff's asserted impairments, whether or not severe, should be considered.

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairment could be the basis of eligibility under the law, <u>we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity</u>.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.  If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 404.1523 (emphasis added).  *See also Railey v. Apfel*, 134 F.3d 383 (10th Cir. 1998); Soc. Sec. Rul. 96-8p (July 2, 1996) (ALJ must consider both severe and nonsevere impairments when assessing RFC).

Plaintiff asserts that the ALJ erred by dismissing Plaintiff's complaints of headaches and urinary leakage at Step Two and never further discussing Plaintiff's limitations due to these complaints.  Plaintiff additionally alleges that the ALJ did not appropriately evaluate her wheezing, asthma, or sleep problems.

In this case, the ALJ dismissed Plaintiff's complaints of headaches and urinary leakage at Step Two.  The ALJ proceeded to consider Plaintiff's physical impairments and her ability to perform work, but never again addressed Plaintiff's impairments that the ALJ dismissed at Step Two.

The regulations and case law is clear.  When an ALJ proceeds past Step Two, the ALJ must consider all of Plaintiff's complaints, even those that the ALJ would have

previously considered non-severe or *de minimis*.   The ALJ did not consider these allegations, and this failure requires reversal.


      Dated this 11th day of May 2006.


                                          Sam A. Joyner
                                          United States Magistrate Judge